UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | : | |
| PARK AVENUE AESTHETIC SURGERY, P.C., | : | Case No. 1:19-cv-09761-JGK |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| EMPIRE BLUE CROSS BLUE SHIELD and GROUPFIRST OF MARYLAND, INC. AND GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC. d/b/a CAREFIRST BLUECROSS BLUESHIELD, | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

**BRIEF OF GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC. d/b/a
CAREFIRST BLUECROSS BLUESHIELD IN SUPPORT OF MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT**

---

**BECKER LLC**
Michael E. Holzapfel, Esq. (*Pro Hac Vice*)
354 Eisenhower Parkway, Suite 1500
Livingston, New Jersey 07039
(973) 251-8943
meholzapfel@becker.legal
Attorneys for Group Hospitalization and
Medical Services, Inc. d/b/a CareFirst
BlueCross BlueShield

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ........................................................................................... iii

STATEMENT OF FACTS ................................................................................................. 3

    Identification of Parties ............................................................................................... 3

    Patient's Surgeries .................................................................................................... 3

    Patient's Plan and Plan Documents .......................................................................... 3

    BlueCard Program ..................................................................................................... 6

    Plaintiff's Charges and Appeals ................................................................................ 9

    Allegations in the Complaint ................................................................................... 10

    Plaintiff's Alleged Derivative Standing and Plan's Prohibition on Assignments ................... 10

    Plan's Limitations Period ......................................................................................... 12

LEGAL ARGUMENT ..................................................................................................... 13

STANDARD OF REVIEW .............................................................................................. 13

    POINT I ...................................................................................................................... 14

    PLAINTIFF LACKS STANDING TO ASSERT AN ERISA § 502(a)(1)(B) CLAIM ........... 14

    POINT II ..................................................................................................................... 18

    THE FAC IS TIME-BARRED AS TO CLAIMS RELATED TO THE 2016 AND 2017 DATES OF SERVICE DUE TO THE PLAN'S CONTRACTUAL LIMITATIONS PERIOD ....................................................................................................................... 18

    POINT III .................................................................................................................... 20

    THE FAC FAILS TO STATE A CLAIM BECAUSE IT DOES NOT TIE PLAINTIFF'S DEMAND FOR ADDITIONAL BENEFITS TO ANY SPECIFIC PLAN TERM ................. 20

CONCLUSION ............................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Access Mediquip, LLC v. UnitedHealthCare Ins. Co.*,
698 F.3d 229 (5th Cir. 2012) ..................................................... 15

*Arkun v. Unum Grp.*,
2017 W.L. 4084050 (S.D.N.Y. Sept. 14, 2017).................................... 19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................ 13

*Atlantic Plastic & Hand Surgery, PA v. Anthem Blue Cross Life and Health Ins. Co.*,
2018 W.L. 5630030 (D.N.J. Oct. 31, 2018)....................................... 20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2001)................................................................ 13

*Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*,
572 F.3d 76  (2d Cir. 2009)....................................................... 18

*CIGNA Corp. v. Amara*,
563 U.S. 421, 438 (2011)........................................................... 5

*Devlin v. Empire Blue Cross & Blue Shield*,
274 F.3d 76 (2d Cir. 2001)........................................................ 20

*Gaboriault v. Int'l Bus. Machines Corp.*,
2006 W.L. 3304213 (D. Vt. Nov. 13, 2006)...................................... 19

*Guerrero v. FJC Sec. Servs.*,
423 Fed.Appx.14 (2d Cir. 2011).................................................. 20

*Heimeshoff v. Hartford Life & Accident Ins. Co.*,
496 F. App'x. (2d Cir. 2012) .................................................... 19

*Hermann Hospital v. MEBA Medical and Benefits Plan*,
959 F.2d 569 (5th Cir. 1992) .................................................... 15

*Howard v. Coventry Health Care of Iowa, Inc.*,
158 F.Supp.2d 937 (S.D. Iowa 2001) ........................................... 21

*In re Merrill Lynch & Co., Inc.*,
273 F. Supp. 2d 351 (S.D.N.Y. 2003) ................................................................. 6

*Krauss v. Oxford Health Plans, Inc.*,
418 F. Supp. 2d 416 (S.D.N.Y. 2005) ............................................................ 22, 23

*LeTourneau Lifelike Orthotics & Prosthetics, Inc. v. Wal-Mart Stores, Inc.*,
298 F.3d 348 (5th Cir. 2002) ............................................................................. 16

*LI Neuroscience Specialists v. Blue Cross Blue Shield of Fla.*,
361 F. Supp. 3d 348 (E.D.N.Y. 2019) ................................................................ 14

*Madison v. Res. for Human Dev., Inc.*,
233 F.3d 175 (3d Cir. 2000) ................................................................................. 4

*Majied v. New York City Dep't of Educ.*,
2018 W.L. 333519 (S.D.N.Y. Jan.8, 2018) ....................................................... 21

*Mbody Minimally Invasive Surgery, P.C. v. Empire Healthchoice Hmo, Inc.*,
2016 W.L. 2939164 (S.D.N.Y. May 19, 2016) ................................................... 18

*McCulloch Orthopedic Surgical Services, PLLC v. Aetna, Inc.*,
857 F.3d 141 (2d Cir. 2017) .......................................................................... 14, 16

*N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*,
798 F.3d 125 (2d Cir. 2015) ............................................................................... 20

*Neuroaxis Neurosurgical Assocs., PC v. Costco Wholesale Co.*,
919 F.Supp.2d 345 (S.D.N.Y. 2013) ................................................................... 14

*Northlake Reg'l Med. Center v. Waffle House Sys. Employee Benefit Plan*,
160 F.3d 1301 (11th Cir.1998) ........................................................................... 20

*O'Neil ex rel. Lord v. Wal-Mart Corp.*,
502 F. Supp. 2d 318 (N.D.N.Y. 2007) ................................................................ 17

*Precision Associates, Inc. v. Panalpina World Transport Holding, Inc.*,
2013 W.L. 6481195 (E.D.N.Y. Sep. 20, 2013) ................................................... 13

*Prof'l Orthopaedic Assocs., PA v. 1199SEIU Nat'l Benefit Fund*,
697 F. App'x. 39 (2d Cir. 2017) ......................................................................... 20

*Prof'l Orthopedic Associates, PA v. Excellus Blue Cross Blue Shield*,
2015 W.L. 4387981 (D.N.J. Jul. 15, 2015) ........................................................ 18

iv

*Pruter v. Local 210's Pension Tr. Fund*,
2016 W.L. 908303 (S.D.N.Y. Feb. 8, 2016) ............................................................................ 21

*Reichelt v. Emhart Corp.*,
921 F.2d 425 (2d Cir. 1990) ................................................................................................... 20

*Tuminello v. Aetna Life Ins. Co.*,
2014 W.L. 572367 (S.D.N.Y. Feb. 14, 2014) ......................................................................... 19

## Statutes

29 U.S.C. § 1022 ......................................................................................................................... 5

29 U.S.C. § 1132 ................................................................................................................. *passim*

29 U.S.C. § 1169 ....................................................................................................................... 17

29 U.S.C. § 1185b ..................................................................................................................... 22

Md. Code Ann., Cts. & Jud. Proc. § 5-101 ............................................................................. 19

N.Y. C.P.L.R. § 213 ................................................................................................................. 19

## Rules

Fed. R. Civ. P. 8 ....................................................................................................................... 13

Fed. R. Civ. P. 12 ..................................................................................................................... 13

## Regulations

29 C.F.R. 2560.503-1 ............................................................................................................... 18

## PRELIMINARY STATEMENT

Defendant Group Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross BlueShield ("CareFirst") submits this brief in support of its motion to dismiss Plaintiff's First Amended Complaint ("FAC") for failure to state a claim.

This lawsuit involves a dispute over health benefits available to patient "L.G." ("Patient") under her employer-sponsored health benefit plan. On November 16, 2016, May 10, 2017, and March 28, 2018, a physician affiliated with Plaintiff performed breast reconstruction on the Patient. Plaintiff is not part of CareFirst's network of participating providers, or that of Defendant Empire Blue Cross Blue Shield ("Empire"). Colloquially, Plaintiff is "out-of-network." On each date of service, the Patient had medical coverage under a self-funded health benefit plan ("Plan") sponsored by her employer, Howard Hughes Medical Institute ("HHMI"). HHMI contracts with CareFirst to provide claims administration services associated with the Plan. There is no dispute that the Plan is an "employee welfare benefit plan" governed by and subject to the Employee Retirement Income Security Act of 1974 ("ERISA").

Following the Patient's procedures, Plaintiff submitted bills to CareFirst – via Empire – for reimbursement under the Plan in the collective amount of $312,927. On behalf of the Plan, CareFirst paid $24,934.70 pursuant to the Plan's prescribed terms and conditions. As it happened, this benefit was a small percentage of Plaintiff's exorbitant bills. The FAC alleges that Plaintiff, dissatisfied with the reimbursement, engaged in the Plan's administrative appeals process seeking additional payment. These appeals did not result in additional payment. Plaintiff now brings this suit against CareFirst and Empire seeking to recover $287,992.30, which represents the difference between what Plaintiff billed and what the Plan paid. Plaintiff seeks this amount from CareFirst

1

via ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), which allows plan "participants" and "beneficiaries" to file civil actions to recover "benefits due [them] under the terms of [their] plan[s]."

As set forth below, the FAC fails to state a claim against CareFirst for three reasons.

First, Plaintiff lacks standing. Plaintiff, an out-of-network provider, is not a "participant" or "beneficiary" with direct standing under ERISA § 502(a)(1)(B). Nor may Plaintiff assert derivative standing under ERISA § 502(a)(1)(B) as an "assignee" because the Plan prohibits assignments.

Second, even if Plaintiff had standing, the FAC's prayer for relief on the November 16, 2016 and May 10, 2017 dates of service is time-barred barred by the Plan's two-year contractual limitations period.

Third, the FAC fails to state a claim under ERISA § 502(a)(1)(B) because it does not tie Plaintiff's demand for reimbursement at its actual charge to any specific Plan term. It is well-established that if a complaint fails to identify which terms of the plan actually require payment of the benefits that the claimant contends are vested and owed, the complaint fails to state a claim.

2

**STATEMENT OF FACTS**

Identification of Parties

Plaintiff is a medical practice group located in New York City. *FAC*, ¶ 12. CareFirst and Empire are licensees of the Blue Cross Blue Shield Association ("Association"). *Id*., ¶¶ 13, 14, 15. Empire issues health plans to, and/or administers health plans for, individuals and groups domiciled in New York. *Id*., ¶¶ 13, 16. CareFirst issues health plans to, and/or administers health plans for, individuals and groups domiciled in Maryland, the District of Columbia, and Northern Virginia. *Id*., ¶¶ 14, 17.

Plaintiff does not participate with either CareFirst or Empire. *Id*., ¶¶ 6, 25, 29. Colloquially, Plaintiff is "out-of-network." *Id*.

Patient's Surgeries

Plaintiff alleges that the Patient "was initially diagnosed with a genetic predisposition to breast cancer and had undergone a bilateral mastectomy[.]" *Id*., ¶ 4.  Incident to this mastectomy, Dr. Keith Blechman, a surgeon affiliated with Plaintiff, along with assistants, performed a two-stage breast reconstruction on the Patient on November 1, 2016 and May 10, 2017. *Id*., ¶¶ 4, 28, 44. Dr. Blechman performed a third surgery on the Patient on March 28, 2018 to correct problems arising from the prior procedures. *Id*., ¶¶ 4, 55.

Patient's Plan and Plan Documents

HHMI, which is based in Chevy Chase, Maryland, sponsors the Plan for the benefit of its eligible employees and their dependents. *FAC*, ¶ 2, 14; *see also Certification of Wanda Lessner* ("Lessner Cert."), Ex. A (p. 37, identifying Plan sponsor information). The Plan, as described in the Summary Plan Description ("SPD") referenced in the FAC, is commonly known as a Section

125 "cafeteria plan," which allows employees to opt-in to certain types of medical, dental, vision, and other benefits (as if ordering from a cafeteria menu) and pay for them on a pre-tax basis. *Lessner Cert.*, Ex. A (SPD, p. 1, 8, referencing IRS Section 125 contributions).[1]

The medical component of the Plan is self-funded (or "self-insured") by HHMI. *Lessner Cert.*, ¶ 6, Ex. A (SPD, p. 1, 24), Ex. B (2016 EOC cover page), Ex. D (2018 EOC cover page). This means that HHMI does not provide medical coverage to its employees by purchasing an "insurance policy" from CareFirst, Empire, or any other carrier under which a carrier agrees to underwrite – and assume the financial risk of – employees' healthcare in exchange for HHMI's payment of premiums. *Id.* Instead, HHMI and its employees (through their contributions to the Plan taken out of their salaries) fund all costs associated with – and assume the financial risk of – employees' healthcare. *Id.*, Ex. A (SPD, p. 1, 7). HHMI contracts with CareFirst to secure access to CareFirst's network of providers, and to have CareFirst handle the administrative tasks associated with the medical component of the Plan (processing claims, handling administrative appeals, etc.), but CareFirst does not assume any financial risk for members' healthcare claims. *Id.*, ¶ 6, Ex. A (SPD, p. 1, 24);  Exs. B and D (2016 and 2018 EOC cover pages, noting "CareFirst provides administrative claims payment services only and does not assume any financial risk or obligation with respect to those claims").

Preliminarily, CareFirst is constrained to address the SPD, from which the FAC purports to quote, and the SPD's relationship to the "terms of the Plan" as a whole, which the FAC

---

[1]      For a general description of cafeteria plans, *see Madison v. Res. for Human Dev., Inc.*, 233 F.3d 175, 178 (3d Cir. 2000).

references throughout. *FAC*, ¶¶ 14, 23, 36, 38, 41, 52, 54, 59, 60, 63, 66, 73, 79, 80, 84, 85. An SPD, as the name suggests, "summarizes" statutorily-defined categories of ERISA information (e.g., names and addresses of plan agents and administrators, plan requirements for eligibility, the source of financing of the plan, etc.), but does not recite all plan terms, conditions, limitations, and exclusions.[2] As the SPD notes: "This document is intended merely as a summary of the official Plan document(s). In the event of any disagreement between this summary and the official Plan document(s), as they may be amended from time to time, the provisions of the Plan documents(s) will govern." *Lessner Cert.*, Ex. A (SPD, p. 38). As the SPD further notes: "This summary should be read in combination with the…Benefit Booklets provided by the insurance companies and service providers. The Benefit Booklets are intended to describe the HHMI benefits available to you as an employee of HHMI….Please see the Benefit Booklets for details of Plan benefits." *Lessner Cert.*, Ex. A (SPD, p. 43).

The "Benefit Booklets" referred to in the SPD are formally known as Evidences of Coverage, or "EOCs." The EOCs set forth the terms, conditions, limitations and exclusions of Plan benefits and coverage. *Lessner Cert.*, Exs. B-D. HHMI, as the self-insuring group, prepares its own SPD, but CareFirst provides the EOCs. *Lessner Cert.*, ¶ 7, Ex. A (p. 1). As far as a hierarchy between the two documents, the SPD contains the following explanation:

> If there is ever a conflict or a difference between what is written in this summary and the Benefit Booklets with respect to **the specific benefits provided**, the Benefit Booklets shall govern unless

---

[2]      *See* 29 U.S.C. § 1022(b); *see also CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011)("statements in a SPD "communicat[e] with beneficiaries *about* the plan, but…do not themselves constitute the *terms* of the plan")(emphasis in original).

otherwise provided by any federal and state law. If there is a conflict between the Benefit Booklets and this summary with respect to **the legal compliance requirements of ERISA and any other federal law**, this summary will rule.

*Id.*, Ex. A (p. 1)(emphasis in original).

Appendix A1 to the SPD is the EOC for the Plan's "preferred provider option" form of coverage in which the Patient was enrolled. The EOCs for the 2016, 2017, and 2018 plan years are attached to the Lessner Cert. as Exhibits B, C, and D, respectively. These are the "terms of the Plan" referenced throughout the FAC. CareFirst notes that the FAC's quotation of a Plan provision regarding coverage for mastectomy-related services (*FAC*, ¶ 73) derives from the EOCs, not the SPD. *Lessner Cert.*, B (2016 EOC, p. 51) and D (2018 EOC, p. 61).

Accordingly, because the FAC extensively relies on and purports to quote from both the SPD and EOC; and because these documents are integral to this lawsuit, in which Plaintiff's thesis is that it has a vested right to additional benefits due under the *terms* of the Plan, the Court may consider all Plan documents as part of this motion. *See In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 356–57 (S.D.N.Y. 2003).

<u>BlueCard Program</u>

One section of the FAC addresses the Association's BlueCard Program. *FAC*, ¶¶ 15-27. The BlueCard Program is discussed in detail in each of the EOCs in the "Inter-Plan Arrangements Disclosure" sections. *Lessner Cert.*, Ex B. (2016 EOC, p. 33), Ex. C (2017 EOC, p. 3), Ex. D (2018 EOC, p. 40). As generally described in the FAC, within the dynamic of this case CareFirst is the "Home Plan" (i.e., the Association licensee that issues and/or administers the plan in which the patient is enrolled), and Empire is the "Host Plan" (i.e., the Association licensee that services the geographic area in which the medical services occur). *FAC*, ¶¶ 16-23. Through BlueCard, a patient

6

enrolled in a Home Plan who resides in or travels to another state (i.e., the "Host Plan's" state) may receive covered services from a provider who participates in the Host Plan's network, and the Home Plan will treat those services as "in-network" services as though the patient had received them from a "Home Plan" participating provider. *Id.*, ¶¶ 15-25; *Lessner Cert.*, Ex. B (2016 EOC, p. 34-25), Ex. C (2017 EOC, p. 3-4), Ex. D. (2018 EOC, p. 40-42). The Host Plan facilitates the claims adjudication process by receiving the healthcare provider's claim and communicating with the provider. *FAC*, ¶ 26.

Plaintiff, however, is out-of-network. *FAC*, ¶¶ 6, 25, 29. Plaintiff is also located outside of the Maryland/DC-Metro area, where HHMI is located and sponsors the Plan, and where CareFirst receives and processes claims. *Id.*, ¶¶ 12, 14, 23. The "Inter-Plan Arrangements Disclosure" sections of the Plan documents set forth how benefits are paid when a Plan member seeks care outside of CareFirst's service area from a provider who does not participate with the Host Plan's network. The 2016 EOC states:

> Typically, Members, when accessing care outside the geographic area CareFirst serves, obtain care from Health Care Providers that have a contractual agreement (i.e., are "PPO/Participating") with the local Blue Cross and/or Blue Shield Licensee in that other geographic area ("Host Blue"). In some instances, Members may obtain care from Non-Participating Providers. CareFirst payment practices in both instances are described below.

***

> **D. Non-Participating Providers Outside the CareFirst Service Area**
>
> **Member Liability Calculation**
>
> 1. In General When Covered Services are provided outside of the CareFirst service area by Non-Participating Providers, the amount(s) a Member pays for such services will generally be based

7

on either the Host Blue's Non-Participating Provider local payment or the pricing arrangements required by applicable state/federal law. In these situations, the Member may be responsible for the difference between the amount that the Non-Participating Provider bills and the payment CareFirst will make for the Covered Services as set forth in this paragraph.

2. Exceptions  In some exception cases, CareFirst may pay claims from Non-Participating Providers outside of CareFirst's service area based on the provider's billed charge, such as in situations where a Member did not have reasonable access to a PPO/Participating Provider, as determined by CareFirst in CareFirst's sole and absolute discretion or by applicable state/federal law. In other exception cases, CareFirst may pay such claims based on the payment it would make if CareFirst were paying a Non-Contracted Provider inside of its service area, as described elsewhere in this Group Contract, where the Host Blue's corresponding payment would be more than CareFirst's in-service area Non-Contracted Provider payment, or in CareFirst's sole and absolute discretion, CareFirst may negotiate a payment with such a provider on an exception basis.

Finally, CareFirst may pay up to billed charges for Group designated Covered Services.

Unless otherwise stated, in any of these exception situations, the Member may be responsible for the difference between the amount that the Non-Participating Provider bills and the payment CareFirst will make for the Covered Services as set forth in this paragraph.

*Lessner Cert.*, Ex. B (2016 EOC, p. 33, 35)

Similarly, the 2017 EOC notes:

When a Member receives care outside of CareFirst's service area, it will be received from one of two kinds of providers. Most providers ("participating providers") contract with the local Blue Cross and/or Blue Shield Licensee in that geographic area ("Host Blue"). Some providers ("nonparticipating providers") don't contract with the Host Blue. CareFirst explains below how CareFirst pays both kinds of providers.

*** 

8

### D. Nonparticipating Providers Outside CareFirst's Service Area

### 1. Member Liability Calculation

When Covered Services are provided outside of CareFirst's service area by nonparticipating providers, the amount a Member pays for such services will normally be based on either the Host Blue's nonparticipating provider local payment or the pricing arrangements required by applicable state law. In these situations, a Member may be responsible for the difference between the amount that the nonparticipating provider bills and the payment CareFirst will make for the Covered Services as set forth in this paragraph. Federal or state law, as applicable, will govern payments for out-of-network emergency services.

### 2. Exceptions

In certain situations, CareFirst may use other payment methods, such as billed charges for Covered Services, the payment CareFirst would make if the healthcare services had been obtained within CareFirst's service area, or a special negotiated payment to determine the amount CareFirst will pay for services provided by nonparticipating providers. In these situations, the Member may be liable for the difference between the amount that the nonparticipating provider bills and the payment CareFirst will make for the Covered Services as set forth in this paragraph.

*Lessner Cert.*, Ex. C (2017 EOC, p. 3, 4)

The 2018 EOC repeats the foregoing language verbatim. *Lessner Cert.*, Ex. D (2018 EOC, p. 40, 41).

<u>Plaintiff's Charges and Appeals</u>

Following each procedure, Plaintiff submitted invoices for its services, the collective amount of which was $312,927. *FAC*, ¶¶ 31, 45, 56, 86. The total paid was $24,934.70. *Id*. Plaintiff contends that the Plan should have paid its actual charges, and it seeks to recover $287,992.30 in additional benefits under the Plan. *Id*., ¶¶ 1, 7, 33, 46, 53, 56, 81, 86. Plaintiff alleges that it engaged

9

in and exhausted the Plan's administrative appeals seeking additional reimbursement, without success. *Id.*, ¶¶ 35, 36 40, 48.

As an out-of-network provider, Plaintiff has the right to balance-bill for any part of its charge not covered by its patient's health plan. As explained above, the Plan documents alert members that if they seek care from a provider outside of CareFirst's service area who does not participate with the Host Plan, they will be responsible for the difference between the amount that the non-participating provider bills and the payment CareFirst makes. *Lessner Cert.*, Ex. B (2016 EOC, p. 35), Ex. C (2017 EOC, p. 4), Ex. D (2018 EOC, p. 41). The FAC does not allege that Plaintiff ever availed itself of its balance-billing remedy.

<u>Allegations in the Complaint</u>

Plaintiff describes this action as "an action under [ERISA], and its governing regulations, concerning Defendants' under-reimbursement to Plaintiff for post-mastectomy breast reconstruction surgical services." *FAC*, ¶ 1. Plaintiff alleges that because the services involve breast reconstruction post-mastectomy, Plaintiff should have been paid its full charge. *Id.*, ¶¶ 70-78. To support this allegation, the FAC contains a non-factual legal summary of the Women's Health and Cancer Rights Act ("WHCRA"), which requires plans to cover breast reconstruction incident to mastectomy in a manner consistent with coverage for other benefits under the plan, and prohibits plans from excluding coverage for breast reconstruction incident to mastectomy as a "cosmetic procedure." *Id*.

<u>Plaintiff's Alleged Derivative Standing and Plan's Prohibition on Assignments</u>

Plaintiff brings this action in a derivative capacity as the Patient's "assignee" or "designated authorized representative" of Plan benefits. *Id.*, ¶¶ 2, 65, 68, 69. The FAC quotes

language in the SPD that Plaintiff contends purports to allow assignments as long as they are given

after the Plan pays the prescribed benefit. *FAC*, ¶¶ 66-67. This language is contained in the "Claims

and Appeals" section of the SPD, which provides:

> **Non-Assignment of Benefits**. Plan participants cannot assign,
> pledge, borrow against, or otherwise promise any benefit payable
> under the Plan before receipt of that benefit. However, benefits will
> be provided to a participant's child if required by a Qualified
> Medical Child Support Order. In addition, subject to the written
> direction of a Plan participant, all or a portion of benefits provided
> by the Plan may, at the option of the Plan, and unless a participant
> requests otherwise in writing, be paid directly to the person
> rendering such service. No payment by the Plan pursuant to such
> direction shall be considered an assignment of benefits or as
> recognition by the Plan of a duty or obligation to pay a provider of
> services or supplies except to the extent the Plan actually chooses to
> do so. Any payment made by the Plan in good faith pursuant to this
> provision shall fully discharge the Plan and HHMI to the extent of
> such payment.

> *Lessner Cert*., Ex. A (SPD p. 36).

The foregoing paragraph pertains to the direction of payments under the Plan. As to the

legal status of a beneficiary under ERISA, the SPD also provides, in a section entitled "**Other**

**Limitations on Rights,**" the following:

> Benefits payable under the Plan will not be subject in any way to
> anticipation, alienation, sale, transfer, assignment, pledge,
> encumbrance or charge of any kind. Any effort to take such an action
> will be void, except to the extent that an applicable Plan either: (a)
> allows for the provision of benefit payments directed to hospitals,
> physicians, and other providers of services in payment for covered
> services or goods; or (b) provides specifically for assignment.

> *Lessner Cert.*, Ex. A (SPD, p. 42)

Consistent with this provision, the 2016 EOC provides, in a bolded section entitled **Assignment**

**of Benefits:** "A Member may not assign his or her right to receive benefits or benefit payments

under this Evidence of Coverage to another person or entity except for routine assignment of benefit payments to Preferred Providers rendering Covered Services." *Lessner Cert.*, Ex. B (2016 EOC, p. 30). The 2017 EOC Renewal Amendment left this language unchanged. *Id.*, Ex. C. Similarly, the 2018 EOC provides, in the same bolded section entitled **Assignment of Benefits:** "A Member may not assign his or her right to receive benefits or benefit payments under this Evidence of Coverage to another person or entity except for routine assignment of benefit payments to a Preferred Health Care Provider/Contracting Pharmacy rendering Covered Services." *Id.*, Ex. D (2018 EOC, p. 33).

Plan's Limitations Period

The SPD states, in a bolded section entitled **Legal Action**: "Before pursuing legal action for benefits under the Plan, you must first exhaust the Plan's claim, review, and appeal procedures. Additionally, any lawsuit you bring for Plan benefits must be filed within 24 months of the date on which your claim is incurred under the Plan." *Lessner Cert.*, Ex. A (SPD p. 32). A claim is "incurred" under the Plan on the date of service. *Lessner Cert.*, Ex. B (2016 EOC p. 6)("Incurred means a Member's receipt of a health care service or supply for which a charge is made"), Ex. D (2018 EOC, p. 8)(same).

The Patient's dates of service are November 1, 2016, May 10, 2017, and March 28, 2018. *FAC*, ¶¶ 28, 44, 55. Plaintiff commenced this action on October 23, 2019, and it amended its pleading to name CareFirst as a defendant on December 18, 2019.

## **LEGAL ARGUMENT**

## **STANDARD OF REVIEW**

Fed. R. Civ. P. 8(a)(2) requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." The Court is required to ensure that the pleading requirements of Rule 8(a)(2) are satisfied. *See Bell Atl. Corp. v. Twombl*y, 550 U.S. 544, 555-56 (2001). Although Rule 8(a)(2) does not require a plaintiff to prove his or her case at the pleading stage by reciting every factual detail, it *does* require "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Complaints that fail to plead with the specificity required by Rule 8 and its interpretive case law are subject to dismissal under Rule 12(b)(6).

In order for the Complaint to survive this motion to dismiss, it must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The Supreme Court established the two-pronged test for determining "plausibility" in *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Under that test, the Court must (1) identify and disregard those pleadings that are mere conclusions, because mere conclusions are not entitled to an assumption of truth; and (2) determine whether the well-pleaded factual allegations that remain—if any—plausibly give rise to an entitlement of relief. *Id*. Further, even though a complaint should be read in a light most favorable to the plaintiff, it must contain enough factual matter to "demonstrate more than a sheer possibility that a defendant has acted unlawfully." *Precision Associates, Inc. v. Panalpina World Transport Holding, Inc.*, 2013 W.L. 6481195, * 5 (E.D.N.Y. Sep. 20, 2013). Conclusory allegations or conclusions of law couched as factual allegations will not suffice. *See id*. (citing *Iqbal*, 556 U.S. at 678). "To avoid dismissal, plaintiffs must plead facts that nudge their claims

13

across the line from conceivable to plausible." *Id*. The FAC fails under these authorities.

<u>**POINT I**</u>

**PLAINTIFF LACKS STANDING TO ASSERT AN ERISA § 502(a)(1)(B) CLAIM.**

      Plaintiff seeks relief against CareFirst solely through ERISA § 502(a)(1)(B), which confers direct standing to "recover benefits…due…under the terms of [a] plan" on plan "participants" and "beneficiaries." 29 U.S.C. § 1132(a)(1)(B). Medical providers meet neither definition, and ERISA confers no direct standing upon providers. *See McCulloch Orthopedic Surgical Services, PLLC v. Aetna, Inc.*, 857 F.3d 141, 146 (2d Cir. 2017). Like most circuits, however, the Second Circuit recognizes *derivative* provider standing if the provider obtains an assignment of benefits. *Id.* at 147.

      To be effective, however, an assignment must first be permissible under the plan. *See Neuroaxis Neurosurgical Assocs., PC v. Costco Wholesale Co.*, 919 F.Supp.2d 345, 351 (S.D.N.Y. 2013). In *McCulloch*, the Second Circuit held that a provider's acceptance of an assignment of benefits under a plan that prohibits assignments is a "legal nullity." *Id*. "*McCulloch'*s conclusion regarding the ineffectiveness of assignments of ERISA plan benefits where the plan contains an unambiguous anti-assignment provision is in accord with other circuits." *LI Neuroscience Specialists v. Blue Cross Blue Shield of Fla.*, 361 F. Supp. 3d 348, 353–54 (E.D.N.Y. 2019). Thus, if a plan unambiguously prohibits assignments, a medical provider "does not have a cause of action to bring an ERISA enforcement claim pursuant to § 502(a)(1)(B)." *Id.*

      Plaintiff recognizes the general enforceability of anti-assignment clauses, but construes the SPD as prohibiting assignments only before a claim is paid, not after. *FAC*, ¶¶ 67-68. The SPD provision to which the FAC cites provides:

14

> **Non-Assignment of Benefits**. Plan participants cannot assign, pledge, borrow against, or otherwise promise any benefit payable under the Plan before receipt of that benefit. However, benefits will be provided to a participant's child if required by a Qualified Medical Child Support Order. In addition, subject to the written direction of a Plan participant, all or a portion of benefits provided by the Plan may, at the option of the Plan, and unless a participant requests otherwise in writing, be paid directly to the person rendering such service. No payment by the Plan pursuant to such direction shall be considered an assignment of benefits or as recognition by the Plan of a duty or obligation to pay a provider of services or supplies except to the extent the Plan actually chooses to do so. Any payment made by the Plan in good faith pursuant to this provision shall fully discharge the Plan and HHMI to the extent of such payment.

> *Lessner Cert.*, Ex. A (SPD p. 36).

This provision is not a legal restriction placed on a Plan member's ability to transfer standing under ERISA, but rather a "spendthrift" clause placing restrictions on the rights of third-parties to take an interest in a plan member's benefits before they are paid.

The Fifth Circuit touched upon this issue in *Hermann Hospital v. MEBA Medical and Benefits Plan*, 959 F.2d 569, 574 (5th Cir. 1992), *overruled in part on other grounds by Access Mediquip, LLC v. UnitedHealthCare Ins. Co.*, 698 F.3d 229 (5th Cir. 2012). In *Hermann*, a hospital sued an insurance company under ERISA in order to recover benefits allegedly assigned by the patient. The insurance company endeavored to make a standing argument based on a plan provision not unlike the foregoing provision, which read: "No employee, dependent, or beneficiary shall have the right to assign, alienate, transfer, sell, hypothecate, mortgage, encumber, pledge, commute, or anticipate any benefit payment hereunder, and any such payment shall not be subject to any legal process to levy execution upon or attachment or garnishment proceedings against for the payment of claims." *Hermann*, 959 F.2d. at 574.

15

The court determined that this language was not a restriction on a plan beneficiary's ability to transfer ERISA § 502(a) standing, but rather a "spendthrift clause" that applied "only to unrelated, third-party assignees – other than the health care provider of the assigned benefits – such as creditors who might attempt to obtain voluntary assignments to cover debts having no nexus with the Plan or its benefits, or even involuntary alienations such as attempting to garnish payments for plan benefits." *Hermann*, 959 F.2d at 575. Although the Court did not suggest that a plan may restrict a member's ability to perfect an assignment through a valid anti-assignment provision, it found that the spendthrift language on which the insurance company relied was not such a restriction.[3]

The SPD provision to which the FAC refers is similar. The provision speaks of assigning, borrowing against, or pledging as collateral Plan benefit payments before they come due. Once a benefit is owed to the member, the provision allows the member to direct its payment to a specific person (e.g., a provider), but the member cannot pledge, assign, or secure an interest in the benefit

---

[3]       Lest there be any confusion, the 1992 *Hermann* opinion does not provide foundation for a policy-based argument for refusing to enforce anti-assignment provisions against medical providers. In fact, the Fifth Circuit subsequently held that anti-assignment provisions are enforceable against providers. *See LeTourneau Lifelike Orthotics & Prosthetics, Inc. v. Wal-Mart Stores, Inc.*, 298 F.3d 348 (5th Cir. 2002). Since *Hermann*, every Circuit Court (including the Second Circuit) to have taken up the issue has held the same. *See McCulloch*, 857 F.3d at 147. *Hermann* is a useful reference, however, for distinguishing between a spendthrift clause and a clause restricting assignments for purposes of transferring ERISA standing.

until it is payable. Notably, the provision makes an exception to this rule for Qualified Medical Child Support Orders, which are ERISA-required orders issued by state administrative agencies that require an alternate beneficiary (e.g., a child or stepchild) to be covered by a plan participant's plan. *See generally* 29 U.S.C. § 1169; *O'Neil ex rel. Lord v. Wal-Mart Corp.*, 502 F. Supp. 2d 318, 319 (N.D.N.Y. 2007). When read in conjunction with the plan as a whole, the foregoing provision is obviously a provision that speaks to choate versus inchoate interests in Plan benefits, and whether those benefits are generally subject to assignment/hypothecation/attachment/etc. by unaffiliated third-parties before benefits come due. Indeed, this same provision also states that "[n]o payment by the Plan pursuant to such direction shall be considered an assignment of benefits[.]" The provision simply does not speak to the pertinent issue of assignments for purposes of transferring a member's rights under ERISA.

However, the SPD's section entitled "Other Limitations on Rights" *does* speak to this issue, as do the EOCs. In a provision entitled "No Assignment of Benefits," the SPD states that any assignment of benefits will be void unless the Plan otherwise allows it. *Lessner Cert.*, Ex. A (SPD, p. 42). But the Plan does *not* otherwise allow it. Quite the opposite, the 2016 EOC (which HHMI renewed for the 2017 plan year) provides: "A Member may not assign his or her right to receive benefits or benefit payments under this Evidence of Coverage to another person or entity except for routine assignment of benefit payments to Preferred Providers rendering Covered Services." *Lessner Cert.*, Ex. B (2016 EOC, p. 30). Similarly, the 2018 EOC provides: "A Member may not assign his or her right to receive benefits or benefit payments under this Evidence of Coverage to another person or entity except for routine assignment of benefit payments to a Preferred Health Care Provider…rendering Covered Services." *Id.*, Ex. D (2018 EOC, p. 33). As explained above,

the EOCs govern the terms, conditions, limitations (e.g., the ability to give an assignment of benefits to an out-of-network provider), and exclusions of the Plan. These documents state that, except for routine assignments of benefit payments to *preferred* (i.e., participating) providers, the Plan does not permit assignments. Accordingly, Plaintiff lacks standing.[4]

### POINT II

**THE FAC IS TIME-BARRED AS TO CLAIMS RELATED TO THE 2016 AND 2017 DATES OF SERVICE DUE TO THE PLAN'S CONTRACTUAL LIMITATIONS PERIOD.**

Because ERISA does not contain a specific statute of limitations for challenging the denial of benefits, courts look to the "most nearly analogous state limitations statute." *See Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan,* 572 F.3d 76, 78 (2d Cir. 2009). The statute of limitations for breach of contract in New York (where the Patient received the medical

---

[4]     In addition to an "assignee," the FAC also describes Plaintiff as an "authorized representative" of the Patient. *FAC*, ¶¶ 2, 65, 69. This designation refers to 29 C.F.R. 2560.503-1(b)(4), which allows an authorized representative of a claimant to act on the claimant's behalf in pursuing an internal administrative appeal of an adverse benefit decision. It is well-established, however, that this regulation applies to *internal* administrative appeals only, not to federal lawsuits brought after those appeals are exhausted, and that the regulation confers no independent standing on providers and cannot be used to override a valid anti-assignment provision. *See Mbody Minimally Invasive Surgery, P.C. v. Empire Healthchoice Hmo, Inc.*, 2016 W.L. 2939164, at *6 (S.D.N.Y. May 19, 2016); *Prof'l Orthopedic Associates, PA v. Excellus Blue Cross Blue Shield*, 2015 W.L. 4387981 (D.N.J. Jul. 15, 2015).

18

services) is six years, and the statute of limitations for breach of contract in Maryland (where HHMI is headquartered, where HHMI sponsors the Plan, and where CareFirst receives and processes healthcare claims) is three years. *See* N.Y. C.P.L.R. § 213; Mᴅ. Cᴏᴅᴇ Aɴɴ., Cts. & Jud. Proc. § 5-101.[5] Regardless of which statute may otherwise apply here, an ERISA plan may provide for a shorter limitations period, which a court must enforce as long as it is not unreasonable. *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 496 F. App'x. (2d Cir. 2012), *aff'd* 571 U.S. 99, 109 (2013). Courts within the Second Circuit consistently apply *Heimeshoff*'s holding. *See, e.g., Arkun v. Unum Grp.*, 2017 W.L. 4084050, at *5 (S.D.N.Y. Sept. 14, 2017), *aff'd,* 767 Fed.Appx. 51 (2d Cir. 2019); *Tuminello v. Aetna Life Ins. Co.*, 2014 W.L. 572367, at *2 (S.D.N.Y. Feb. 14, 2014).

The SPD states: "[A]ny lawsuit you bring for Plan benefits must be filed within 24 months of the date on which your claim is incurred under the Plan." *Lessner Cert.*, Ex. A (SPD p. 32). A claim is "incurred" on the date of service. *Lessner Cert.*, Ex. B (2016 EOC p. 6), Ex. D (2018 EOC, p. 8). Here, the Patient's first two dates of service were November 1, 2016 and May 10, 2017. Both dates are more than two years before Plaintiff first filed this lawsuit. There is, moreover, no persuasive argument that the Plan's two-year limitations period is unreasonable. *See, e.g., Gaboriault v. Int'l Bus. Machines Corp.*, 2006 W.L. 3304213, * 6 (D. Vt. Nov. 13, 2006) (upholding two-year limitation period). Indeed, courts have upheld limitations periods of far shorter duration. *See, e.g., Northlake Reg'l Med. Center v. Waffle House Sys. Employee Benefit*

---

[5]     CareFirst maintains that Maryland's three-year statute of limitations would otherwise apply here, and CareFirst reserves its rights on this point.

*Plan,* 160 F.3d 1301, 1304 (11th Cir.1998) (upholding 90–day limitation period). Thus, even if the Plan did not prohibit assignments, the FAC is time-barred as to the first two dates of service.

<u>**POINT III**</u>

**THE FAC FAILS TO STATE A CLAIM BECAUSE IT DOES NOT TIE PLAINTIFF'S DEMAND FOR ADDITIONAL BENEFITS TO ANY SPECIFIC PLAN TERM.**

ERISA § 502(a)(1)(B) allows a plan participant or beneficiary to bring a civil action "to recover benefits due to him under *the terms of his plan.*" 29 U.S.C. § 1132(a)(1)(B)(emphasis added). "Only the words of the Plan itself can create an entitlement to benefits," and an ERISA lawsuit for benefits "stands and falls by the terms of the plan." *Atlantic Plastic & Hand Surgery, PA v. Anthem Blue Cross Life and Health Ins. Co.*, 2018 W.L. 5630030, at * 7 (D.N.J. Oct. 31, 2018); *see also Reichelt v. Emhart Corp.*, 921 F.2d 425, 430 (2d Cir. 1990)(plan documents, not prior practice of parties, governs right to severance benefits under plan); *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 82 (2d Cir. 2001).

A complaint that fails to tie a demand for additional ERISA benefits to a plan term fails to state a claim. In *Prof'l Orthopaedic Assocs., PA v. 1199SEIU Nat'l Benefit Fund*, 697 F. App'x. 39 (2d Cir. 2017), for example, the Second Circuit affirmed the District Court's dismissal of the plaintiff's § 502(a)(1)(B) claim where the complaint alleged that the defendant was "required to pay the 'usual, customary and reasonable rates' for services rendered by the out-of-network providers ... but it fail[ed] to identify any provision in the plan documents requiring the [defendant] to pay such rates." *Id*. at 41 (citing *Guerrero v. FJC Sec. Servs*., 423 Fed.Appx.14, 17 (2d Cir. 2011); *see also N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 135 (2d Cir. 2015)(affirming dismissal of Section 1132(a)(1)(B) claim where complaint failed to "satisfy the Twombly pleading standard" by not "identify[ing the] patients' plans or the terms of their plans");

*Majied v. New York City Dep't of Educ.*, 2018 W.L. 333519 (S.D.N.Y. Jan.8, 2018) (dismissing plaintiff's § 502(a)(1)(b) claim for wrongful denial of benefits because"[s]uch barebones allegations are insufficient to state a claim").

The FAC fails to tie Plaintiff's contention that the Plan should have paid Plaintiff's actual charge to any particular plan term. In fact, the FAC completely ignores the specific provisions of the Plan which govern how benefits are administered under BlueCard when a Home Plan member receives out-of-network services in the Host Plan's service area. As explained above, such payments will generally be based on the Host Plan's out-of-network rate, unless federal or state law requires otherwise. *Lessner Cert.*, Ex. B (2016 EOC, p. 33, 35); Ex. C (2017 EOC, p. 3, 4); Ex. D (2018 EOC, p. 40, 41). Nothing in the Plan documents' pertinent sections mandate that the Plan pay 100% of Plaintiff's actual charge. Accordingly, the FAC fails to sufficiently plead a claim under ERISA § 502(a)(1)(B). *See, e.g., Pruter v. Local 210's Pension Tr. Fund*, 2016 W.L. 908303 (S.D.N.Y. Feb. 8, 2016), *vacated and remanded on other grounds*, 858 F.3d 753 (2d Cir. 2017) (dismissing 502(a)(1)(B) claim because "Plaintiffs cite no authority—from the Plan or otherwise for the proposition that Plaintiffs' past service credits were converted into future service credits upon being fully funded, and the Court finds none upon a review of the Plan.").

The WHCRA – which the FAC cites at length – does not change the analysis. Preliminarily, the WHCRA does not provide for a stand-alone cause of action, nor did Congress, in enacting the WHCRA, "inten[d] to create…a remedy supplemental to remedies available within ERISA." *Howard v. Coventry Health Care of Iowa, Inc.*, 158 F.Supp.2d 937, 941 (S.D. Iowa 2001), *aff'd* 293 F.3d 442 (8th Cir. 2002). Thus, the WHCRA does not carve out any special exceptions to ERISA insofar as a claimant's right to benefits is concerned. *See id.* at 942-943. Indeed, the statute

expressly states that it shall not affect or modify ERISA's provisions with respect to group health plans. 29 U.S.C. § 1185b(e)(2).

The WHCRA provides that an insurer who provides a plan participant with benefits in connection with a mastectomy and breast reconstruction shall also provide coverage for: (1) all stages of reconstruction of the breast on which the mastectomy has been performed; (2) surgery and reconstruction of the other breast to produce a symmetrical appearance; and (3) prostheses and physical complications of mastectomy, including lymphedemas. 29 U.S.C. § 1185b(a). The insurer must also provide written notice to its participants of the above coverage required by the WHCRA. *Id.* § 1185b(b). The Plan documents comply with this directive. *See Lessner Cert.*, Ex. A (SPD's WHCRA Disclosure, p. 23), Ex. B (2016 EOC's WHCRA Disclosure, p. 51), Ex. D (2018 EOC's WHCRA's Disclosure, p. 61).

The WHCRA imposes no requirement other than that a plan cover mastectomy-related breast reconstruction to the same extent it covers other benefits. 29 U.S.C. § 1185b(a)("Such coverage may be subject to annual deductibles and coinsurance provisions as may be deemed appropriate ad as are consistent with those established for other benefits under the plan or coverage."). While nothing *prevents* a plan from negotiating a particular reimbursement with a provider of mastectomy-related breast reconstruction services (*see FAC*, ¶ 70 (citing 29 U.S.C. § 1185b(d)), nothing in the WHCRA *requires* a plan to do so.

The WHCRA also does not obligate a plan to create any special exceptions to its in-network/out-of-network coverage terms for breast reconstruction services as far as quantum of reimbursable benefits. *See, e.g., Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 625-630 (2d Cir. 2008). Indeed, in *Krauss*, the District Court made the following holding, which the Second

22

Circuit affirmed:

> At the time WHCRA was under consideration, insurers quite commonly refused to pay for breast reconstruction after mastectomy, on the ground that it was a "cosmetic" procedure and was "not medically necessary." The statute addressed this problem by requiring insurers to reimburse their insureds for post-mastectomy breast reconstruction. Nothing in the legislative history affirmatively indicates that the insurer must offer better coverage for breast reconstruction than it offers for the mastectomies that necessitate them, or for other life-saving procedures. There is no mention in the legislative history of any need to reimburse plastic surgeons more fully than other surgeons, and it defies logic to assume that Congress would have imposed such a requirement sub silentio, or by negative inference. Yet that is what plaintiffs would have me conclude. I decline to do so.

> Plaintiffs refer this Court to the Senate debate on the bill, in which Senators spoke of the need to "guarantee the right to have a complete reconstruction," and to "restore a woman's wholeness" through mandatory insurance coverage of post-mastectomy breast reconstruction. But neither those statements nor any other made during the Senate debate either flat out says or fairly implies that an insurance provider must "restore a woman's wholeness" by reimbursing her for 100% of the amount billed by her surgeon, regardless of the other terms and conditions of the Plan. The bill only states that "coverage" must be provided. It is beyond cavil that plaintiffs received "coverage" for her reconstruction surgery. And, as will be seen below, Ms. Krauss received it on exactly the same basis as she received coverage for her other surgeries. In other words, the coverage was commensurate with the terms and conditions of her policy and did not discriminate against this particular form of surgery.

> *Krauss v. Oxford Health Plans, Inc.*, 418 F. Supp. 2d 416, 426–27 (S.D.N.Y. 2005), *aff'd*, 517 F.3d 614 (2d Cir. 2008).

This holding applies here. Although Plaintiff takes the position that the WHCRA entitles Plaintiff to 100% reimbursement of its billed charges, the terms and conditions of the Plan notwithstanding, courts have expressly rejected this position. Nothing in the Plan or any applicable law compels the result the Plaintiff seeks and the FAC must be dismissed.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the FAC with prejudice as to CareFirst.

                            **BECKER LLC**
                            Attorneys for CareFirst


By:      /s/ *Michael E. Holzapfel, Esq.*
               Michael E. Holzapfel

Dated: March 13, 2020

24

## <u>CERTIFICATION OF COMPLIANCE</u>

I hereby certify that the foregoing brief in support of CareFirst's motion to dismiss contains 6,929 words (exclusive of the cover page, table of contents, table of authorities, and this certification), which is fewer than the 7,000-word maximum imposed by Section 2(D) of the Court's individual practices. I further certify that the foregoing brief complies with the additional requirements imposed by Section 2(D) of the Court's individual practices.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

/s/ <i>Michael E. Holzapfel</i>_____<br>MICHAEL E. HOLZAPFEL

Dated: March 13, 2020