**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————————

PARK AVENUE AESTHETIC SURGERY, P.C.,

                **Plaintiff,**

      **- against -**

EMPIRE BLUE CROSS BLUE SHIELD AND
GROUPFIRST OF MARYLAND, INC. AND
GROUP HOSPITALIZATION AND MEDICAL
SERVICES, INC., D/B/A CAREFIRST
BLUECROSS BLUESHIELD,

              **Defendants.**

————————————————————————

      **19-cv-9761 (JGK)**

      <u>**OPINION AND ORDER**</u>

**JOHN G. KOELTL, District Judge:**

    The plaintiff, Park Avenue Aesthetic Surgery, P.C. ("Park Avenue"), a medical provider, has brought this action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 <u>et seq.</u> ("ERISA"), seeking payment for services rendered from Empire Blue Cross Blue Shield ("Empire") and GroupFirst of Maryland, Inc. and Group Hospitalization Medical Services, Inc. d/b/a CareFirst Blue Cross Blue Shield ("CareFirst"). The plaintiff seeks to recover benefits pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), alleging that the defendants underpaid for a series of three breast reconstruction surgeries performed on the plaintiff's patient ("L.G."), who was enrolled in a healthcare insurance plan (the "Plan"), for which CareFirst provided administration services. The defendants have each filed a motion to dismiss the plaintiff's First Amended

Complaint ("FAC"). For the reasons explained below, the motions to dismiss are granted.

## I.

When deciding a motion to dismiss pursuant to Rule 12(b)(6), courts accept the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.2007).[1] The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id.

---

[1]  Unless otherwise noted, this Opinion and Order omits all alterations, omissions, emphasis, internal quotation marks, and citations in quoted text.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that either are in the plaintiff's possession or were known to the plaintiff when the plaintiff brought suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); see also Morillo v. Grand Hyatt New York, No. 13-cv-7123, 2014 WL 3498663, at *6 (S.D.N.Y. July 10, 2014).

"[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant[s'] motion to dismiss, without converting the proceeding to one for summary judgment." Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995). Because the documents governing the patient L.G.'s insurance plan are referenced in the FAC and are integral to deciding the defendants' motion to dismiss, this Court may consider the Summary Plan Description ("SPD") and Evidences of Coverage ("EOCs"), submitted by the defendants. See, e.g., Mbody Minimally Invasive Surgery, P.C. v. Empire Healthchoice Hmo, Inc., No. 13-cv-6551, 2016 WL 2939164, at *3 (S.D.N.Y. May 19, 2016).

## II.

The following facts are taken from the FAC and submitted Plan documents.

The plaintiff, a medical provider with its principal office in New York City, specializes in breast reconstruction and other microsurgical procedures.  FAC ¶ 12.  Empire and CareFirst are both healthcare insurance companies, and licensees of the Blue Cross Blue Shield Association ("BCBSA"). Id. ¶¶ 13-17. BCBSA licensees, such as CareFirst and Empire, are allocated exclusive geographic regions within which to offer or administer insurance plans and contracts with providers. Id. ¶¶ 15-18. Empire offers and administers Blue Cross Blue Shield-branded health care insurance plans in the State of New York. Id. ¶¶ 13, 16. CareFirst similarly offers and administers plans in Maryland, the District of Columbia, and Northern Virginia. Id. ¶¶ 14, 17. Under the BCBSA Blue Card Program, a BCBSA licensee plan member can receive medical services within the network of a BCBSA licensee in a different geographic region (a "Host Plan"), and such services are treated as "in-network" and as if they were received from the BCBSA licensee within the geographic market area where the member is enrolled (a "Home Plan"). Id. ¶¶ 15-26.  Even when out-of-network providers deliver services, the "Home Plan" relies on the "Host Plan" for communicating with providers, including billing communications. Id. ¶¶ 24-25.

4

The present dispute arose out of three operations the plaintiff and its affiliates performed on a patient, L.G. L.G. was diagnosed with a genetic predisposition to breast cancer and underwent a bilateral mastectomy. Id. ¶ 4. Incidental to this mastectomy, Dr. Keith Blechman, a surgeon affiliated with the plaintiff, and his colleagues performed a highly specialized two-stage breast reconstruction on L.G. on November 1, 2016 ("2016 Surgery") and May 10, 2017 ("2017 Surgery"). Id. ¶¶ 4, 28, 44. Dr. Blechman then performed a third surgery on L.G. on March 28, 2018 to correct problems arising from the two prior procedures ("2018 Surgery"). Id. ¶¶ 4-5, 55.

During the relevant period, L.G. had health insurance coverage through a health benefits plan offered by her employer, the Howard Hughes Medical Institute ("HHMI"), which contracts with CareFirst to administer its group health care insurance plan (the "Plan"). Id. ¶ 2. HHMI sponsors the Plan for its employees and their dependents, and allows employees to opt-in to certain medical, dental, or other benefits. Lessner Decl. Ex. A, at 1.

The plaintiff claims that prior authorization was received for each of the three surgeries. FAC ¶¶ 30, 44, 55. CareFirst was L.G.'s "Home Plan," (the BCBSA licensee that actually administered her plan), and Empire served as the "Host Plan" (the BCBSA licensee that services the geographic area where L.G. received the services). Id. ¶¶ 22-25.

After the 2016 Surgery, the plaintiff submitted invoices to Empire for $157,664.00. FAC ¶ 31.  Dr. Blechman, and his colleague who assisted with the 2016 surgery, did not participate in Empire's network. Id. ¶¶ 5, 28-29. The defendants determined that the allowed reimbursement amount was $16,470.38, leaving $141,193.62 unreimbursed, and L.G. received an Explanation of Benefits ("EOB") on June 21, 2017, stating that the charge "exceeds the maximum amount we allow for this service." Id. ¶¶ 33-34.  The plaintiff filed an internal appeal on December 13, 2017, and the appeal was denied on January 8, 2018. Id. ¶ 35. The plaintiff alleges that this appeal exhausted the administrative appeals process under the Plan. Id. ¶ 36. The plaintiff alleges that the denial letter—stating that the claim was "processed and paid correctly as per pricing allowance"—was signed by a representative of the "BlueCard Program Dedicated Service Center," and was on Empire stationery. Id. ¶ 37.

For the 2017 Surgery, the plaintiff submitted an invoice to Empire for $104,850. Id. ¶ 45.  The allowed reimbursement amount was determined to be $6,030.87, leaving an unreimbursed amount of $98,819.13. Id. ¶¶ 45-46.  The plaintiff filed an appeal of the allowed reimbursement amount for the 2017 Surgery in October 2017, and a second appeal in February 2018.  Id. ¶ 48.  The plaintiff alleges that it received a letter from CareFirst, with a final adverse benefit decision on March 26, 2018, stating that

"[w]e have declined to provide reimbursement (in whole or part) for the treatment or service noted in the claim(s)." Id. ¶¶ 48-49. The plaintiff alleges that this exhausted its available administrative remedies for the 2017 Surgery reimbursement. Id. ¶ 48.

After the 2018 Surgery, the plaintiff submitted an invoice to Empire for $59,413.00, of which the defendants paid $2,433.45, leaving the $56,979.95 unreimbursed. Id. ¶ 56. The plaintiff filed an appeal in March 2019, and the plaintiff received a letter on Empire stationery, from a "BlueCard Program Dedicated Service Center" representative, on May 7, 2019, with a final adverse benefit decision, affirming the amount paid. Id. ¶¶ 57-58. The plaintiff alleges it submitted a second appeal on June 3, 2019 and that it exhausted its administrative remedies for the 2018 Surgery. Id. ¶ 57.

HHMI provides its employees with a Summary Plan Description (the "SPD") to satisfy its obligations under ERISA, to "summarize" and "describe[]" the benefits provided under its employee welfare plans, including the Plan at issue here. Lessner Decl. ¶ 8; Ex. A, at 1. Attached to the SPD are Appendices, referred to as "Benefit Booklets" or "Evidences of Coverage" ("EOCs"), that are "provided by the insurance companies and service providers" to set forth "the use of network providers, the composition of the network, and the circumstances, if any,

under which coverages will be provided for out-of-network services." Lessner Decl. Ex. A, at 1. Included among these Appendices are the EOCs prepared by CareFirst, which purport to set out the terms of the Plan's medical coverage.  The defendants provided a declaration, with copies of the SPD (which HHMI did not revise over the relevant period), the 2016 EOC, 2017 EOC, and 2018 EOC. See Lessner Decl. ¶¶ 7-12; Exs. A-D.

The plaintiff alleges that it received an "Assignment of Benefits" from L.G., which included a provision appointing the plaintiff as her "Authorized Representative." FAC ¶¶ 65, 69.  The plaintiff alleges that through this "Assignment of Benefits," L.G. "assign[ed] and convey[ed] directly to Dr. Keith M. Blechman and [the plaintiff] . . . all medical benefits and/or insurance reimbursement, if any, otherwise payable to [L.G.] for services rendered" as well as "any claim, cause of action, or other right" to pursue such claims. FAC ¶ 65.

The plaintiff acknowledges that the SPD has provisions prohibiting the "Assignment of Benefits," but alleges such provisions do not apply to the assignment at issue here, because it was made after L.G. received the benefits and was "under-reimbursed." Id. ¶¶ 66-68. The relevant provision of the SPD provides:

> **Non-Assignment of Benefits.** Plan participants cannot assign, pledge, borrow against, or otherwise promise any benefit payable under the Plan before receipt of that benefit. However, benefits will be provided to a participant's child

> if required by a Qualified Medical Child Support Order. In
> addition, subject to the written direction of a Plan
> participant, all or a portion of benefits provided by the
> Plan may, at the option of the Plan, and unless a
> participant requests otherwise in writing, be paid directly
> to the person rendering such service. No payment by the Plan
> pursuant to such direction shall be considered an assignment
> of benefits or as recognition by the Plan of a duty or
> obligation to pay a provider of services or supplies except
> to the extent the Plan actually chooses to do so. Any
> payment made by the Plan in good faith pursuant to this
> provision shall fully discharge the Plan and HHMI to the
> extent of such payment.

Lessner Decl., Ex. A, at 36.  The SPD document also provides, a

few pages later:

> Benefits payable under the Plans will not be subject in any
> way to anticipation, alienation, sale, transfer, assignment,
> pledge, encumbrance or charge of any kind. Any effort to
> take such an action will be void, except to the extent that
> an applicable Plan either: (a) allows for the provision of
> benefit payments directed to hospitals, physicians, and
> other providers of services in payment for covered services
> or goods; or (b) provides specifically for assignment.

Id., at 42.  In relevant part, the 2016 EOC states that "[a]

Member may not assign his or her right to receive benefits or

benefit payments under this [EOC] to another person or entity

except for routine assignment of benefit payments to Preferred

Providers rendering Covered Services." Lessner Decl. Ex. B, at

30. The 2017 EOC left the provision unchanged, and the 2018 EOC

features nearly identical language. Lessner Decl. Ex. C; Ex. D,

at 33. Under each EOC, "Preferred Providers" refers to medical

providers who "contract[] with CareFirst to be paid directly for

rendering Covered Services," and are considered to be in-network.

Lessner Decl. Ex. B, at 8; Ex. C; Ex. D, at 9.

The SPD and EOC also contain provisions setting out limitations on a claimant's time to pursue a legal action for benefits. In relevant part, the SPD also states that:

> Before pursuing legal action for benefits under the Plan you must first exhaust the Plan's claim, review and appeal procedures. Additionally, any lawsuit you bring for Plan benefits must be filed within 24 months of the date on which your claim is incurred under the Plan.

Lessner Decl. Ex. A, at 32. Under each of the 2016, 2017, and 2018 EOCs, "Incurred" is defined to mean "a Member's receipt of a health care service or supply for which a charge is made." Lessner Decl. Ex. B, at 6; Ex. C; Ex. D, at 8.

The plaintiff filed a Complaint on October 23, 2019 and, with leave of the Court, filed its FAC on December 17, 2019. See ECF Nos. 1, 13.

### III.

Together, CareFirst and Empire move to dismiss the plaintiff's FAC on three grounds.  First, both defendants allege that the plaintiff has failed to plead facts sufficient to establish it has a cause of action under ERISA.[2] Second, both

---

[2] While CareFirst and Empire have argued that the plaintiff lacks "statutory standing," this argument is actually a claim that the plaintiff has failed to state a cause of action, under Section 502 of ERISA. See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc., 821 F.3d 352, 359 (2d Cir. 2016) ("The Supreme Court has recently clarified . . . that what has been called 'statutory standing' in fact is not a standing issue, but simply a question of whether the particular plaintiff 'has a cause of action under the statute'" and that "[t]his inquiry 'does not belong' to the family of standing inquiries, because 'the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case.'")(quoting Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 127-28 & n.4 (2014)).

defendants argue that claims for the 2016 Surgery and 2017
Surgery are time-barred. Third, the defendants both assert that
the plaintiff has failed to state a claim for relief under ERISA
§ 502(a)(1)(B), because the plaintiff has failed to identify
which provision of the Plan documents required the three
surgeries to be reimbursed up to the entire billed charge. In
addition, Empire argues that, as a "Host Plan," without "total
control" to decide claims for benefits, it is not a proper
defendant on the plaintiff's ERISA § 502(a)(1)(B) claim.

### A.

Section 502(a)(1)(B) of ERISA authorizes a health insurance
plan "participant" and "beneficiary" to a bring civil action "to
recover benefits" improperly withheld or otherwise to enforce
"rights under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B);
See Rojas v. Cigna Health & Life Ins. Co., 793 F.3d 253, 256 (2d
Cir. 2015). Both the terms "participant" and "beneficiary" are
defined by statute, 29 U.S.C. § 1002(7)-(8), and the plaintiff
concedes that it does not satisfy either definition. Because
"ERISA carefully enumerates the parties entitled to seek relief
under § 502," Franchise Tax Bd. of State of Cal. v. Constr.
Laborers Vacation Tr. for S. Cal., 463 U.S. 1, 27 (1983), courts
are instructed to construe ERISA § 502 narrowly "to permit only
the parties enumerated therein to sue directly for relief," Simon
v. Gen. Elec. Co., 263 F.3d 176, 177 (2d Cir. 2001). See also

Chemung Canal Tr. Co. v. Sovran Bank/Md._, 939 F.2d 12, 14 (2d Cir.1991) ("[I]n the absence of some indication of legislative intent to grant additional parties standing to sue, the list in § 502 should be viewed as exclusive.").

Within this Circuit, courts have recognized a "narrow exception," that permits "healthcare providers to whom a beneficiary has assigned his claim in exchange for health benefits" to bring a civil action under ERISA § 502. Am. Psychiatric Ass'n v. Anthem Health Plans, Inc., 821 F.3d 352, 361 (2d Cir. 2016). To avail itself of this limited exception, "the assignee must establish the existence of a valid assignment." Mbody Minimally Invasive Surgery, P.C., 2016 WL 2939164, at *4. "The validity of assignments for ERISA purposes is a question of federal common law," to which courts "apply traditional principles of contract interpretation." Med. Soc'y of N.Y. v. UnitedHealth Grp. Inc., No. 16-cv-5265, 2019 WL 1409806, at *8 (S.D.N.Y. Mar. 28, 2019). Applying such principles, courts must "interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience," Critchlow v. First UNUM Life Ins. Co. of Am., 378 F.3d 246, 256 (2d Cir. 2004), and must not "rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous," Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan, 572 F.3d 76, 81 (2d Cir. 2009). Language in a plan "is ambiguous

when it is capable of more than one meaning when viewed
objectively by a reasonably intelligent person who has examined
the context of the entire agreement." Critchlow, 378 F.3d at 256.
But if an ERISA plan unambiguously prohibits assignments, "an
attempted assignment will be ineffectual and thus insufficient to
support a cause of action for the assignee." Neuroaxis
Neurosurgical Assocs., PC v. Costco Wholesale Co., 919 F. Supp.
2d 345, 351-52 (S.D.N.Y. 2013).

        Both defendants argue that the Plan's documents expressly
contained unambiguous "anti-assignment" provisions, and thus the
alleged assignment from L.G. to the plaintiff is void.  The
plaintiff counters by pointing to a provision of the SPD, that
states that assignments before the benefit is paid are forbidden,
and argues that it is thus at least ambiguous whether assignments
after the benefit is paid are permissible. Central to the dispute
is the parties' disagreement over which documents contain the
terms of the contract to be interpreted.  The plaintiff argues
that the language of the SPD controls, and accuses the defendants
of seeking to introduce language from the EOCs to resolve what
might appear ambiguous under the SPD.  The defendants counter
that the EOCs contain the terms of the plan, and thus the
language in the EOCs controls over any potential ambiguity in the
SPD, which merely purports to "summarize" the Plan's terms.

The plaintiff's argument both oversimplifies the caselaw and misreads the SPD. First, the plaintiff cannot bring a claim under Section 502(a)(1)(B) to enforce the provisions of the SPD itself. As the Supreme Court emphasized in CIGNA Corp. v. Amara, ERISA summary plan descriptions, such as the SPD, "provide communication with beneficiaries about the plan, but . . . their statements do not themselves constitute the terms of the plan for purposes of § 502(a)(1)(B)." 563 U.S. 421, 438 (2011). As such, the cause of action pursuant to ERISA § 502(a)(1)(B) is to enforce the terms of the plan, as found in the comprehensive plan documents, not the summary plan descriptions). Nor does ERISA § 502(a)(1)(B) authorize courts to modify the terms of the plan to match the descriptions in the summary plan descriptions. See Laurent v. PricewaterhouseCoopers LLP, 945 F.3d 739, 746 (2d Cir. 2019); see also Amara, 563 U.S. at 436 ("[ERISA § 502(a)(1)(B)'s] language speaks of enforcing the terms of the plan, not of changing them."). Thus, after Amara, courts in this Circuit have understood that "to the extent that the language of a 'plan summary' conflicts with the actual terms of the plan, the terms of the plan control." Schussheim v. First Unum Life Ins. Co., No. 09-cv-4858, 2012 WL 3113311, at *3 (E.D.N.Y. July 31, 2012); see also Aerocare Med. Transp. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local 1249 Ins. Fund, No. 18-cv-90, 2018 WL 6622192, at *6 (N.D.N.Y. Dec. 18, 2018) ("Therefore, if the Court were to

find a conflict between the Trust Agreement and the Summary Plan Description, the Trust Agreement's anti-assignment provision would control.").

Here, by the SPD's own description, the EOCs serve as the "official Plan documents," whereas the SPD "is intended merely as a summary of the official Plan document(s)." Lessner Decl. Ex. A, at 38. Further, the SPD makes clear that in the event of "any disagreement between this summary and the official Plan document(s), as they may be amended from time to time, the provisions of the Plan document(s) will govern." Id. Thus, not only does the SPD not purport to be an integrated agreement, but it expressly directs parties to consult the official Plan documents – the EOCs – for the governing terms.

The defendants correctly note that the 2016 EOC, 2017 EOC, and 2018 EOC each contain an explicit and unambiguous anti-assignment provision: "A Member may not assign his or her right to receive benefits or benefit payments under this [EOC] to another person or entity except for routine assignment of benefit payments to Preferred Providers rendering Covered Services." Lessner Decl. Ex. B, at 30.[3] Because the plaintiff has alleged it is not "in-network," FAC ¶ 29, it is not a "Preferred Provider," and thus cannot fit within this exception.

---

[3] The 2017 EOC left this unchanged and the 2018 EOC included nearly identical language. See Lessner Decl. Ex. C; Ex. D, at 33. The plaintiff has not alleged that any minor changes between the 2016 and 2017 EOC and the 2018 EOC have any dispositive effect in this case.

Moreover, the SPD itself is not ambiguous regarding assignments. While the SPD provision on which the plaintiff relies prohibits assignments before benefits are received and is silent on the permissibility of assignments after benefits are paid,[4] the SPD contains another, more explicit prohibition on assignments:

> Benefits payable under the Plans will not be subject in any way to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge of any kind. Any effort to take <u>such an action will be void, except</u> <u>to the extent that an applicable Plan either</u>: (a) allows for the provision of benefit payments directed to hospitals, physicians, and other providers of services in payment for covered services or goods; or (b) provides specifically for assignment.

Lessner Decl. Ex. A, at 42 (emphasis added). The plaintiff's attempt to interpret the silence of one provision to demonstrate ambiguity within the SPD thus fails in the face of this second provision that plainly and unambiguously makes clear that the default rule is that assignments are not permitted, and that participants must look to the terms of "an applicable Plan" (here, the EOCs) to determine if certain limited exceptions may apply. Reading the SPD as a whole makes clear that the plaintiff has failed to demonstrate any ambiguity within the SPD <u>itself</u> regarding assignments, or that its assignment fits within the

---

[4] The defendant CareFirst suggests this silence is because the provision is intended as a "spendthrift" clause to prevent garnishment, assignment, attachment, or hypothecation of the benefit due by unaffiliated third-parties before it is paid to the beneficiary.

limited applicable exceptions.[5] There is nothing in the SPD that contradicts the anti-assignment provisions in the EOCs, which, in any event, prevail. As such, the plaintiff's acceptance of the assignment from L.G. was ineffective and a "legal nullity" - ineffective and insufficient to support its cause of action against the defendants pursuant to ERISA § 502(a)(1)(B). McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc., 857 F.3d 141, 147 (2d Cir. 2017).

In its papers, the plaintiff argued that because it has been designated by L.G. as her "Authorized Representative," pursuant to 29 C.F.R. § 2560.503-1(b)(4), it is entitled to pursue available remedies on the plaintiff's behalf, including a cause of action under ERISA § 502(a)(1)(B). Courts that have considered similar arguments, have held that a medical provider's status as an Authorized Representative does not negate an unambiguous anti-assignment provision, or otherwise independently provide a cause of action pursuant to ERISA § 502(a)(1)(B). See, e.g., Aerocare Med. Transp. Sys., Inc., 2018 WL 6622192, at *8; Med. Soc'y of

---

[5] The plaintiff argues that the Plan did "allow for the provision of benefit payments directed to hospitals, physicians and other providers of services in payment for covered services," citing to allegations in the Complaint involving the defendants' determining the allowed reimbursed amount for various billed services and paying the reimbursed amount to the plaintiff. However, the defendants' decision to make direct payments to a medical service provider does not change the terms of the Plan itself and does not mean that the defendants have waived the benefit of an anti-assignment provision. As other courts in this Circuit have recognized, the "fact that [an insurer] has reserved for itself the right to make direct payments to healthcare providers does not suggest that the Plan members also have the right to unilaterally assign rights to healthcare providers." Neuroaxis, 919 F. Supp. 2d at 355; see also Med. Soc'y of N.Y., 2019 WL 1409806, at *9; Merrick v. UnitedHealth Grp. Inc., 175 F. Supp. 3d 110, 122 (S.D.N.Y. 2016).

N.Y. v. UnitedHealth Grp. Inc., No. 16-cv-5265, 2017 WL 4023350,
at *7 (Sept. 11, 2017); Mbody Minimally Invasive Surgery, P.C.,
2016 WL 2939164, at *6. At oral argument of the current motions,
the plaintiff disclaimed any reliance on this argument.

**B.**

CareFirst and Empire argue that claims for benefits relating
to the 2016 and 2017 surgeries are time-barred, because the
plaintiff filed its initial Complaint in October 2019, after the
Plan's statute of limitations period had elapsed.

The Supreme Court has instructed that courts "must give
effect to the Plan's limitations provision unless we determine
either that the period is unreasonably short, or that a
'controlling statute' prevents the limitations provision from
taking effect." Heimeshoff v. Hartford Life & Acc. Ins. Co., 571
U.S. 99, 109 (2013).[6] Parties may even agree to a plan limitations
period "that starts to run before the cause of actions accrues,
as long as the period is reasonable." Id. at 106; see also Arkun
v. Unum Grp., No. 15-cv-8425, 2017 WL 4084050, at *5 (S.D.N.Y.
Sept. 14, 2017), aff'd, 767 F. App'x 51 (2d Cir. 2019).

In this case, the SPD specifies that "[a]ny lawsuit you
bring for Plan benefits must be filed within 24 months of the

---

[6] Without consideration of the Plan's terms, the applicable statute of
limitations for breach of contract claims in New York (where the services were
rendered) is 6 years, N.Y.C.P.L.R. § 213, whereas the statute of limitations
period for breach of contract in Maryland (where HHMI is headquartered, where
the Plan is sponsored, and where CareFirst receives and processes claims) is 3
years, Md. Code Ann., Cts. & Jud. Proc. § 5-101.

date on which your claim is incurred under the Plan." Lessner Decl. Ex. A, at 32. The EOCs define "incurred" to mean the date of service. Lessner Decl. B, at 6; Ex. C; Ex. D, at 8. The plaintiff's attempts to offer alternative definitions for "incurred" lack support and fail because they are contrary to the Plan's definition of "incurred" in the EOCs.[7] As such, for the 2016 Surgery (on November 1, 2016), the plaintiff has alleged that the appeal concluded on January 8, 2018, FAC ¶¶ 35-36, leaving the plaintiff (or L.G.) nearly ten months to file.  For the 2017 Surgery (on May 10, 2017), the plaintiff has alleged it received the final adverse benefit decision on March 26, 2018, leaving well over a year to file. Id. at ¶ 48. These are not unreasonably short periods of time within which to file suit, nor has the plaintiff alleged as such. See, e.g., Heimeshoff, 571 U.S. at 109 (concluding that the plaintiff being left with "approximately one year" after a final denial of benefits was not "unreasonably short"); Tuminello v. Aetna Life Ins. Co., No. 13-cv-938, 2014 WL 572367, at *2 (S.D.N.Y. Feb. 14, 2014) (holding a claim was time-barred and that a period of nine months for claimant to file suit after a final denial of benefits was not unreasonably short). Further, the plaintiff has not alleged that any "extraordinary circumstances" warrant equitably tolling the limitations period, such as unreasonable delays in the

---

[7] The plaintiff argues that "incur" means "to become liable," but has not offered any evidence or authority to support this claim.

administrative review process or other forms of "the
administrator's conduct" that "cause[d] a participant to miss the
deadline." Heimeshoff, 571 U.S. at 114.  Thus, the plaintiff's
claims relating to the 2016 Surgery and 2017 Surgery are time-
barred, under the terms of the Plan.

**C.**

The defendants argue that the plaintiff has failed to state a
claim because it has not connected its demand for total
reimbursement of the outstanding balance to a specific term of
the Plan. The plaintiff invokes the Women's Health and Cancer
Rights Act of 1998, Pub. L. 105-277, §§ 901-03, 112 Stat. 2681
(1998) (codified at 29 U.S.C. § 1185b) (the "WHCRA") to argue
that the defendants should have reimbursed the entire unpaid
balance of the three operations, or "should have approved Dr.
Blechman as an out-of-network specialist but ensured that [L.G.]
received her breast reconstruction surgery at the in-network
level of patient responsibility." FAC ¶¶ 77-78.  The plaintiff
appears to argue that the reimbursement decision violated both
the Plan and the "federal mandate" of the WHCRA.

The plaintiff has not identified which terms of the Plan
entitled L.G. (or the plaintiff) to 100% reimbursement, or even
that L.G. may have been entitled to an "in-network" reimbursement
rate for Dr. Blechman's services that was higher than what was

paid.[8] Beyond generalized allegations, the plaintiff has not pleaded with specificity how the wrong reimbursement rates were applied or supported its allegations that it is entitled to "billed charges."

Further, the plaintiff's attempt to argue that the WHCRA requires the defendants to have paid full billed charges is not supported by the text of the statute and runs counter to authority within this District interpreting the provision at issue. In relevant part, the WHCRA requires that group health plans:

> shall provide, in a case of a participant or beneficiary who is receiving benefits in connection with a mastectomy and who elects breast reconstruction in connection with such mastectomy, coverage for--
>> **(1)** all stages of reconstruction of the breast on which the mastectomy has been performed;
>> **(2)** surgery and reconstruction of the other breast to produce a symmetrical appearance; and
>> **(3)** prostheses and physical complications of mastectomy, including lymphedemas;
> in a manner determined in consultation with the attending physician and the patient. Such coverage may be subject to annual deductibles and coinsurance provisions as may be deemed appropriate and as are consistent with those established for other benefits under the plan or coverage.

---

[8] The plaintiff has included several allegations that the defendants violated the terms of the Plan, ERISA, and ERISA's implementing regulations in 29 C.F.R. § 2560.503-1, particularly relating to the manner by which the appeals process was conducted. See, e.g., FAC ¶¶ 38-41, 52, 59-64. However, the FAC does not include a claim under the regulation, or otherwise connect these allegations to a specific claim or request for relief. The plaintiff has failed to provide factual allegations or supporting legal authority to connect these alleged regulatory violations to an entitlement to the entire unreimbursed amount of L.G.'s surgeries paid.

29 U.S.C. § 1185b(a).  The WHCRA also prohibits a group health plan from "penalize[ing] or otherwise reduc[ing] or limit[ing] the reimbursement of an attending provider, or provid[ing] incentives (monetary or otherwise) to an attending provider, to induce such provider to provide care to an individual participant or beneficiary in a manner inconsistent with this section." 29 U.S.C. § 1185b(c)(2).  The plaintiff asserts that such provisions require group health plans to treat breast reconstruction operations differently from other operations, and argues that 29 U.S.C. § 1185b(c)(2)'s requirement to not "limit" or "reduce" reimbursement required the defendants to pay the billed charge.

But the plaintiff interprets these provisions too broadly. Section § 1185b(a) requires that plans provide "coverage" – not that such "coverage" be more favorable or on better terms than all other operations. Further, the most reasonable reading of Section § 1185b(c)'s prohibition on "reduc[ing]" a reimbursement for breast reconstruction surgery is not that the entire billed cost must be paid, but that the reimbursed amount cannot be treated worse than other comparable, covered procedures, or otherwise structured in a manner than might induce providers not to offer the service to their patients.

As Chief Judge McMahon noted when faced with a similar claim for complete reimbursement of breast augmentation surgery, nothing in the text or legislative history of the WHCRA suggested

a patient is entitled to "100% of the amount billed by her
surgeon, regardless of the other terms and conditions of the
Plan," because the WHCRA only states that "coverage" must be
provided.  Krauss v. Oxford Health Plans, Inc., 418 F. Supp. 2d
416, 427 (S.D.N.Y. 2005), aff'd, 517 F.3d 614 (2d Cir. 2008);
accord Prestige Inst. for Plastic Surgery, P.C. v. Keystone
Healthplan E., No. 20-cv-496, 2020 WL 7022668, at *9 (D.N.J. Nov.
30, 2020).  The plaintiff seeks to distinguish Krauss by arguing
that the court did not consider Section 1185b(c), but this is
unpersuasive. Instead, based on the pleadings and Plan documents,
there is no plausible allegation that the Plan failed to provide,
as the WHCRA requires, "coverage" for L.G.'s reconstructive
surgery that "was commensurate with the terms and conditions of
her policy and did not discriminate against this particular form
of surgery." Krauss, 418 F. Supp. 2d at 427. Indeed, at the
argument of the current motions, the plaintiff disclaimed
reliance on the WHCRA.

### D.

Finally, Empire argues that it is not a proper defendant for
an ERISA § 502(a)(1)(B) claim because, as a "Host Plan," it
merely provided claim administration services. The plaintiff
cites to language in New York State Psychiatric Ass'n, Inc. v.
UnitedHealth Grp., in which the Court of Appeals noted that the
plain text of ERISA § 502(a)(1)(B) "does not preclude suits

against claims administrators." 798 F.3d 125, 132 (2d Cir. 2015).
Prior to the decision in New York State Psychiatric Ass'n, "the
longstanding rule in the Second Circuit was that only a plan
administrator or trustee could be held liable under [Section
501(a)(1)(B)]." Gallagher v. Empire HealthChoice Assurance, Inc.,
339 F. Supp. 3d 248, 254 (S.D.N.Y. 2018). The Court of Appeals in
New York State Psychiatric Ass'n, recognized a limited exception:
"where the claims administrator has 'sole and absolute
discretion' to deny benefits and makes 'final and binding'
decisions as to appeals of those denials, the claims
administrator exercises total control over claims for benefits
and is an appropriate defendant in a [Section 501(a)(1)(B)]
action for benefits." New York State Psychiatric Ass'n, 798 F.3d
at 132.

Although the New York State Psychiatric Ass'n court declined
to "decide whether a claims administrator that exercises less
than total control over the benefits denial process is an
appropriate defendant under [ERISA] § 502," id. at 132 n.5,
courts in this Circuit, noting the prior longstanding rule, have
consistently held that some indicia beyond mere "discretion" is
necessary to meet the statutory definition of an ERISA Plan
administrator. Bushell v. UnitedHealth Grp. Inc., No. 17-cv-2021,
2018 WL 1578167, at *8 (S.D.N.Y. Mar. 27, 2018); see also
Gallagher, 339 F. Supp. 3d at 254; Easter v. Cayuga Med. Ctr. at

Ithaca Prepaid Health Plan, 217 F. Supp. 3d 608, 630-31 (N.D.N.Y. 2016) (dismissing a claims administrator that "does not have sole and absolute discretion to deny benefits . . . and does not make final and binding decisions," because there is "no governing precedent for holding a claims administrator with less than total control responsible" under ERISA § 502).

In this case, the plaintiff has not alleged that Empire had "sole and absolute discretion" or the authority to make "final and binding" decisions regarding appeals, such that Empire had "total control" over the benefits denial process.  At best, the plaintiff alleges that the final adverse benefit communications for the 2016 Surgery and 2018 Surgery were transmitted with "Empire stationery"; however, the plaintiff alleges the letters were signed by representatives of the "BlueCard Program Dedicated Service Center." Empire is not mentioned anywhere within the SPD or EOCs, and the plaintiff has not alleged facts from which it could be inferred that Empire itself excised total control over the benefits denial process. Therefore, the plaintiff has failed to allege sufficient facts to show that Empire is a proper defendant in this case.

## Conclusion

The Court has considered all of the arguments raised by the parties.  To the extent not specifically addressed, the arguments are either moot or without merit.  For the reasons explained

above, the defendants' motions to dismiss are **granted.**  If the plaintiff seeks to file a second amended complaint, it must move to amend the complaint within 30 days from the date this Opinion and Order is issued.  Any request to file an amended complaint should include a copy of the proposed amended complaint and state with particularity why such a request would not be futile.  If the plaintiff fails to file a motion to file a second amended complaint, this dismissal will become a dismissal with prejudice. The Clerk is directed to close all pending motions.

**SO ORDERED.**

**Dated:      New York, New York**
**            February 19, 2021               /s/ John G. Koeltl**
**                                          John G. Koeltl**
**                                    United States District Judge**